action insists on an act done by him as endorsor. He did not give a consideration for the bill, but only paid to the person who did give a consideration for it; and instead of advancing to accommodate, he as a debtor, paid to fulfil his own engagement. His case is not within the contemplation of the understanding of *Wood* to pay to those who should advance for *Brown*, and it therefore seems to me, to be competent to *Wood* to show that there is no consideration between him and the appellee.

Not being able to discover how the payment of *Repold* can be viewed as a consideration, and it appearing to me that the want of consideration may be shown between the parties to this action, it is my opinion that the court below erred in refusing to give to the jury the directions prayed for. I am for reversing the judgment.

JUDGMENT AFFIRMED.

1810.
Owings
vs
Reynolds

---

## OWINGS vs. REYNOLDS, *et al.* Lessee.

DECEMBER.

ERROR to the General Court. This was an action of ejectment for a tract of land called *Taylor's Forest*, lying in *Baltimore* county. The case as agreed upon, and submitted to the court, was this: John Owings, deceased, being seized in fee of the tract of land called *Taylor's Forest* by his last will and testament, dated the 8th of February 1762, devised, (among other things,) as follow: "And as to what it has pleased God to bless me with, I dispose as follows," &c. "I give and bequeath to my son *Caleb Owings*, 60 acres of land, being part of a tract of land called *Taylor's Forest*, beginning," &c. "I give and bequeath to my loving wife, *Asenath Owings*, my dwelling plantation, and the remainder part of my part of *Taylor's Forest*, joining the said plantation, except the 60 acres willed to my son *Caleb*, to her during her natural life, and after her decease to fall to my son *Lot Owings*; and if he should die under age, its my will the said land should fall to my son *Caleb*, and my daughter *Asenath Odell*." John Owings,

J O, by his will, devised as follows: "I give and bequeath to my loving wife A O, my dwelling plantation, &c. to her during her natural life, and after her decease to fall to my son L O; and if he should die under age, its my will the said land should fall to my son C O, and my daughter A O" Held, that L O took only an estate for life.

F A, by his will, devised as follow: "I give and bequeath all the land that I am possessed of, to be equally divided between my two sons A and J, to them and their heirs, for ever; but if in case either of my said sons should die without any heir lawfully begotten of his body, or before he arrives to the age of 20 years, that his heirs and assigns is that the division line

then in such case his part to be the sole right and property of my surviving son, for ever." "Item Whereas I have given all my land to my two sons, my will is shall begin at," &c. "my son A to have the first choice of the land." "Item. my will and desire is, that my son A do, out of *his* part of my estate, expend so much money as will be sufficient to give my son J a good education;" and the testator appointed his son A his executor. A died above the age of 20 years, intestate, and without issue, leaving J his only brother, his heir at law. It seems to have been held by *Hanson*, Chan. that A took a fee simple under the devise. (*Note*)

Held by *Hanson*, Chan. that the following words in the last clause in the above will, viz "out of *his part of my estate*," be transposed so that the clause should read, "My will and desire is, that my son A do expend so much money as will be sufficient to give my son J a good education, out of his part of my estate." (*Note*)

1810.

Owings
vs
Reynolds

shortly after the execution of his will, died seized and possessed of the land therein mentioned. *Asenath Owings*, wife of *John Owings*, the testator, after her husband's death entered upon the land, and became possessed thereof, claiming the same under the devise, and occupied and possessed it until her death, which happened some time in the month of April 1792. *Lot Owings* named in the will, attained the age of 25 years, and died intestate in the year 1773, leaving the lessors of the plaintiff, *Rachel*, *Nancy*, *Sarah* and *Lot*, his heiresses at law, and who have intermarried with *Nicholas*, *Charles* and *John Reynolds*, and *John Peck*, the other lessors of the plaintiff. The defendant, *Caleb Owings*, is the same person named in the will of *John Owings*, to whom, and a certain *Asenath Odell*, the land was limited over by the will, in case *Lot Owings* should die under age; and *Caleb Owings*, the defendant, is the eldest son and heir at law of *John Owings*, the testator.

CHASE, Ch. J.   The question submitted to the court in this case is, what estate is devised to *Lot Owings* by the will of his father *John Owings*, in the lands in question— an estate in fee simple or for life?

It is admitted that there are not any words of limitation or inheritance in this will superadded to the devise of *Lot Owings*; and also, that unless the testator has used words in his will indicating an intention to give a fee in the lands in controversy to *Lot Owings*, an estate for life only passed to him. But it is contended, the testator has used words in his will which, when the several parts of it are considered together, plainly import an intention to give a fee to *Lot Owings*; and three circumstances are principally relied on as indicative of such intention—1. The introductory clause—2. The limitation over to *Caleb Owings* and *Asenath Odell*, if *Lot Owings* died in his minority; and 3. There being no clause disposing of the residue.

It is established beyond controversy, that the intention of the testator is to prevail if not repugnant to some rule or principle of law; and that such intention is to be collected from the words of the will. That no technical words are necessary to create a fee. But the principle established by analogy to the rules prevailing in the limitation of estates by deed at common law is, that if law is given ge-

nerally without adding words of limitation, an estate for life only passes; and this rule, though it often interferes with and defeats the intention of the testator, is so firmly settled, that no probable conjecture can shake it. As there are not any words appropriated in a will to the creation of a greater estate than for life, the courts, without infringing the above rule, have decided, that if it appears on consideration of the whole will, to be the plain intention to give a fee in the land, a fee passes. It is also an established rule in the construction of a will, that the heir at law is not to be disinherited unless by express words or necessary implication.

Having premised thus much, I will now consider those circumstances from which it is said a plain intention in the testator to give a fee to *Lot Owings*, is to be inferred.

Introductory clauses are in general mere form, and inserted without any particular or precise meaning being annexed to them; for almost every person who makes a will, sets down with an intention to dispose of his whole estate; and therefore they cannot have much influence—and only in favour of the clear intention of the testator. *Denn vs. Gaskin, Cowp.* 659, 660.

The introductory clause in this case, "as to what it has pleased God to bless me with," can have no weight to induce the court to decide a fee passed to *Lot Owings*. It does not contain the word *estate*, nor any word of similar import, from whence an inference can be drawn, by coupling it with the clause in question, that the intention was to give a fee; and besides, there are no words to *connect* the *devise* of the land in question with the *introduction*, so as to pass the whole interest. *Denn vs. Gaskin, Cowp.* 660.

As to the limitation over, if *Lot* died in his minority. It appears to me, the meaning of the testator, to be collected from the words of his will, was that *Lot Owings* should have an estate for life, with a contingent remainder to *Caleb Owings* and *Asenath Odell* for their lives, on the contingency of *Lot Owings* dying in his minority. But if the contingency did not happen, there are no words to show *Lot's* estate was to be enlarged to a fee. If it could be implied, it is by no means a necessary implication, for the substitution was not to the heir at law, but to *Caleb Ow-*

*ings* and *Asenath Odell.* *Fowler vs. Blackwell*, 1 *Com. Rep.* 353.

*Caleb Owings* is the heir at law who is entitled to that part of the real estate which is not disposed of; and the heir at law is not to be disinherited unless by express words or necessary implication. *Gascoign vs. Barker*, 3 *Atk.* 10. 2 *Ba. Ab.* 66, 81. *Byas vs. Byas*, 2 *Ves.* 164, 165.

Nothing can be inferred from the testator's not disposing of the residue.

In order to make a devise of lands, *without any limitation* added, a fee, such an intention must appear as is sufficient to satisfy the conscience of the court in pronouncing it such; if it is barely problematical, the rule of law must take place. *Roe vs Blackett, Cowp.* 240..

DUVALL and DONE, J. were of opinion, that *Lot Owings* took a fee, and judgment was consequently entered on the *case stated*, for the plaintiff, and the defendant brought the present writ of error.

The cause was argued before POLK, BUCHANAN, and GANTT, J.

*Ridgely*, *T. Buchanan* and *Harper*, for the plaintiff in error, cited *Frogmorton vs. Holyday*, 3 *Burr.* 1618; and *Tomkins vs. Tomkins*, cited in 1 *Burr.* 234.

*Johnson*, (Attorney General) for the defendant in error, referred to *Brogden vs. Walker's Ex'r.* &c. 2 *Harr. & Johns.* 285, and *Chew's Lessee vs. Weems*, 1 *Harr. & M'- Hen.* 463. S. C. 2 *Harr. & Johns.* 173, *(note.)* He also referred to the case of *Frazier's creditors vs. Frazier's heirs*, in the court of chancery, (a.)

THE COURT reversed the judgment of the General Court.

GANTT, J. gave no opinion.

JUDGMENT REVERSED.

(a) In the case of *Frazier's creditors vs. Frazier's heirs*, a bill was filed by the creditors of *Alexander Frazier*, for the sale of his real estate, for the payment of his debts. The answer of *John Alexander Frazier*, an infant defendant, by his guardian, among other things stated, that *Alexander Frazier* died in June 1790, above the age of twenty years, intestate, and without leaving issue, leaving the said *J. A. Frazier*, his only brother, his heir at law. That the father of *Alexander* and *J. A. Frazier*, by his will dated the 18th of March 1777, devised among other things as follows, viz. "I give

and bequeath all the land that I am possessed of to be equally divided between my two sons, *Alexander* and *John Alexander*, to them and their heirs, for ever; but if in case either of my said sons should die without any heir lawfully begotten of his body, or before he arrives to the age of twenty years, that then in such case his part to be the sole right and property of my surviving son, his heirs and assigns, for ever." "*Item*. Whereas I have given all my land, to my two sons, my will is that the division line shall begin at *Rake's* land, and so running towards *Fishing creek*. My son *Alexander* to have the first choice of the land " "*Item*. My will and desire is, that my son *Alexander* do, out of *his* part of my estate, expend so much money as will be sufficient to give my son *John Alexander* a good education." By the will the testator appointed his son *Alexander* his executor. It was submitted to the chancellor to determine what estate passed to *Alexander* under this devise. It does not appear from the papers in the case that the chancellor decided what estate *Alexander* took under the devise. In November 1795, an agreement was entered into by the counsel of the parties, in which it is stated that *Alexander*, under the will of his father, had the right of election as to which part of the land he would choose; and it being doubtful whether any election was made by him, and also doubtful whether the court of chancery could determine the fact of election, for the prevention of controversy in future, it was agreed that the chancellor, with the consent of parties, should decree a sale of the whole of the lands devised, &c. the proceeds of the land to be equally divided between the creditors of *Alexander* and the defendant, each one half. The chancellor decreed accordingly. A sale having been made, *J. A. Frazier* exhibited an account, in which, amongst other matters, he charged the deceased as follows, viz:

"To a charge on the estate for default of expending
money in the education of *John Alexander Frazier*, as
directed by the will of *Alexander Frazier*, (the father,)
deceased, say 8 years at £40 per year,  £320 0 0."

Hanson, Chancellor, (August 1799.) This charge is founded on the claimant's construction of his father's will. Now supposing it the intent of the will to charge *Alexander* with his brother's education and maintenance, the strangest words imaginable are used. It is not "I give *Alexander* one half of my estate on condition that he lay out the sum of —in the complete education and maintenance of his brother at some approved school," or, "I will that the part of my estate devised to *Alexander* be charged with the expense of providing a good education to his brother, and likewise completely maintaining him at some approved school." No! it is, "my will and devise is, that my son *Alexander*, do, *out of his part of the estate*, expend so much money as will be sufficient to give my son *John Alexander* a good education."

It is apparent from the whole will, (setting aside this disputed part,) that the testator contemplated perfect equality between his two sons, except that he gives *Alexander*, the elder, the choice of two equal parts, and makes him executor; which is just what was reasonable, &c.

Now, by changing the disposition of the words, and putting "*out of his part of the estate*," at the end of the clause, it stands perfectly consistent with that intended equality, and it is well observed by counsel, that transpositions are frequently made for the purpose of supporting a rational construction of the whole. It may be observed, that there are few men, who, in speaking or writing do not express themselves in such a manner, that if you understand them, according to the strict rules of grammar, you make them speak contrary to their intention.

It is alleged, without proof, that *Alexander* was burthened with the education of his brother, on account of his (the said *Alexander's*) having already received a good education; and that by so charging him, equality was preserved. But it is not so. In such a case, the eldest son would be educated at the charge of the whole estate, and the younger at the charge of the elder's part.

For illustration, suppose the whole estate to be £4000, and that £500 had been expended in educating *Alexander*, more than had been expended on *John*. To make them equal it ought to be directed that £500 shall be expended on *John*, and the residue divided between them. In that case, they will have been educated at equal expense, and the share of each will be £1750. But according to the construction contended for, they will have been educated at equal expense, and *John* will get £500 more than his brother; that is, they each share £2000 out of the £4000, *John* has his part clear; but £500 is taken from *Alexander* to educate and maintain *John*. When the contemplation of equality is so apparent, when an easy obvious transposition will support that equality, and when, without the transposition, such inequality takes place, it is impossible to admit the claimant's construction of the will.

"My will and desire is, that my son *Alexander*, out of his part of the estate, shall expend so much money," &c. as already has been observed, is strange language to constitute a charge on *Alexander's* part. "My will and desire," are words very significant. "To expend so much money," are equally so. In short, the meaning of the whole clause was, that *Alexander*, the executor, should be authorised to lay out as much of *John's* part of the personal estate, as would suffice to give him a liberal education; without this provision in the will, *John's* education might be defective. The guardian, whom he might choose, or who might be appointed without the provision, might not think proper to expend so much money as might suffice, particularly if the annual profits should not correspond with the proofs in this cause, or might happen in some year to fall short.

In addition to all this—supposing us compelled to take *his* for *Alexander's*, it may be asked, whether good education *must* comprehend maintenance; or whether, to prevent the great inequality in favour of a younger son, education might not mean barely the price of tuition, books, &c? Lodging, food and clothing, must be had, whether at school or at home; and therefore it might be said, that he who is charged with education is not of course charged with those articles of necessity.

In construing a will, it is notorious that the judges have never considered the question as a mere point of grammar. The question ever is, "what was the intent of the testator," to be collected from the whole of his words. Amongst grammarians there is no doubt that *his* is considered in propriety as referring to the antecedent, if there be one, and not to a subsequent. It may indeed, in this case, be contended that the testator was not aware of any antecedent, or any rule of grammar. It is probable that he was no grammarian.

Let it just be supposed that he had appointed *two executors*, and had said "my will and desire is, that *my executors*, (instead of saying *my son Alexander*,) do, out of *his* part of my estate, expend," &c. is there even a rigid grammarian who would say, that the testator violated the rules of grammar. No! he would say, *"his"* refers to the antecedent, if there be one, but the word *"his"* may well be placed so as to refer to a subsequent, as is the case of Mr. *Frazier* directing his two executors, out of his part of the estate, to educate his son *John Alexander*.

On the whole, from the fullest investigation of this case, and on full deliberation, it does not appear to the chancellor that *John Alexander Frazier* hath any just claim against the estate of *Alexander Frazier*.